UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
SEATTLE DIVISION

| | | |
|---|---|---|
| JAMES ROSS, Derivatively on Behalf of ZILLOW GROUP, INC., | ) ) ) | Case No. |
| Plaintiff, | ) ) | VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY |
| v. | ) ) ) | |
| JEREMY WACKSMAN, RICHARD N. BARTON, ERIK BLACHFORD, AMY C. BOHUTINSKY, JUN CHOO, LLOYD D. FRINK, J. WILLIAM GURLEY, JAY C. HOAG, JEREMY HOFMANN, GREGORY B. MAFFEI, GORDON STEPHENSON, CLAIRE CORMIER THIELKE, and APRIL UNDERWOOD, | ) ) ) ) ) ) ) ) ) ) | [FILED UNDER SEAL] |
| Defendants, | ) ) | |
| -and- | ) ) | |
| ZILLOW GROUP, INC., a Washington Corporation, | ) ) ) | |
| Nominal Defendant. | ) ) ) | |

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

Plaintiff, James Ross ("Plaintiff"), by his undersigned attorneys, submit this Verified Stockholder Derivative Complaint for breach of fiduciary duty against defendants herein on behalf of Zillow Group, Inc ("Zillow" or the "Company"). Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of Plaintiff's counsel, which included, among other things, a review of the Company's public filings with the U.S. Securities and Exchange Commission, news reports, press releases, and other publicly available sources, as well as the Company's confidential internal books and records produced in response to Plaintiff's inspection demand under Revised Code of Washington Section 23B.16.020 and the common law, all of which books and records are incorporated by reference into this Complaint. For the avoidance of doubt, this incorporation by reference does not change the pleading standard applicable to any motion to dismiss that may be filed in this case.

**<u>NATURE AND SUMMARY OF THE ACTION</u>**

1.      This is a stockholder derivative action brought by Plaintiff on behalf of nominal defendant Zillow against certain of its former and current officers and directors for breach of fiduciary duty. As a result of their misconduct, Zillow suffered substantial harm, including but not limited to money damages, reputational damage, exposure to significant securities litigation liability, and massive destruction of stockholder value.

2.      Zillow operates a web platform for buying, selling, renting, and financing homes, serving as a real estate marketplace and information hub. It provides services like home listings with virtual tours, a "Zestimate" tool for property valuation, and tools for landlords and renters to manage leases and payments. The platform also connects users with real estate agents, mortgage lenders, and other professionals.

3.      One of Zillow's erstwhile competitors was Redfin Corporation ("Redfin"), a technology-powered real estate brokerage that provides services for buying, selling, and renting

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

- 1 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

homes.[1] Redfin operates an online platform offering brokerage services, mortgage loans, and title and settlement services, all with the goal of making the real estate process more efficient and cost-effective for customers. Redfin integrates technology, such as map-based search and machine learning, with the services of local agents who are paid a salary plus bonuses instead of traditional commissions.

4.    In 2021, Redfin acquired its competitor, RentPath, for $608 million.[2] RentPath operated leading apartment rental websites, including ApartmentGuide.com, Rent.com, and Rentals.com.[3] In real estate parlance, these websites are known as Internet Listing Services ("ILS") – centralized databases where property managers and landlords can post vacancies with photos, floor plans, and pricing, allowing prospective renters to easily search for housing in their area. With the acquisition of RentPath, Redfin became a major competitor to Zillow in the ILS space, particularly for listings for multifamily rental properties (buildings with more than twenty-five units).

5.    The competition between Zillow and Redfin is no more. On February 6, 2025, Zillow and Redfin executed two agreements: a Partnership Agreement and a Content License Agreement (together, the "Agreements") that removed Redfin as an independent competitor in the multifamily rental ILS advertising market.

6.    Under the Partnership Agreement, Zillow paid $100 million in exchange for Redfin terminating all of its multifamily advertising contracts and shutting down that line of business. Under the Content License Agreement, Zillow became the exclusive provider of multifamily listings across Redfin's rentals network, and Redfin agreed not to display any third-party multifamily listings or to compete for multifamily advertising customers of its own for as long as nine years. The compensation

---

[1] In July 2025, the Rocket Companies, Inc. acquired Redfin. Redfin is now a wholly-owned subsidiary of Rocket.

[2] https://www.prnewswire.com/news-releases/redfin-completes-acquisition-of-rentpath-for-608-million-301261996.html

[3] https://www.prnewswire.com/news-releases/redfin-completes-acquisition-of-rentpath-for-608-million-301261996.html

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT          - 2 -          TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

structure for this arrangement includes a per-lead payment from Zillow to Redfin, subject to a first-year minimum of $75 million.

7.    Although billed as a "partnership," the Agreements enabled Zillow to take over Redfin's multifamily ILS business. Zillow and Redfin were two of the top three firms by revenue in the rental ILS industry. The Agreements consolidated the multifamily ILS segment in blatant violation of federal antitrust laws, including Section 1 of the Sherman Act and Section 7 of the Clayton Act.

8.    As expected, state and federal government antitrust agencies soon sued Zillow over the Agreements. On September 30, 2025, the Federal Trade Commission ("FTC") sued Zillow in the United State District Court for the Eastern District of Virginia in an action captioned *Federal Trade Commission v. Zillow Group, Inc. et al.*, Case No. 1:25cv1638 (E.D. Va.) (the "FTC Action"). On May 6, 2026, the Court denied defendants' motion to dismiss the FTC Action, holding that the FTC adequately alleged "what appears from the face of the complaint to be clearly anti-competitive conduct" and that "an observer with even a rudimentary understanding of economics could conclude that the [Agreements] have an anticompetitive effect on customers and markets." *See* FTC Action, ECF No. 154 at 3 n.4. The FTC investigation and subsequent antitrust action have already caused Zillow significant monetary harm in the form of materially increased legal expenses, before even taking into account any future settlement or judgment, let alone current and future non-economic harm such as reputational damage and lost opportunities.

9.    Zillow misleadingly played down the risk of regulatory exposure and concealed the existence of the FTC's investigation into its business practices. When Zillow finally acknowledged the magnitude of "headwind" to the Company's financial results caused by its regulatory exposure and the antitrust litigation on May 14, 2026, its Class A stock price dropped by over 15% from $44.83 to $37.86 per share. During the same time period, Zillow's Class C stock price e dropped by over 16% from $44.53 to $37.37 per share. In total, the Company's market capitalization fell by

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT

- 3 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

approximately $1.6 billion, and its stock price continues to languish.[4] This has led to Zillow being sued in a securities fraud class action in the United States District Court for the Western District of Washington on behalf of Zillow's investors, in an action captioned *Breidert v. Zillow Group, Inc. et al.*, Case No. 2:26-cv-2016 (W.D. Wash.) (the "Securities Class Action").

10.     While Zillow and its investors have fared poorly from the Agreements, the same cannot be said for the Company's fiduciaries who sold over $87 million worth of their personally held stock near Zillow's stock price highs, before news of the FTC's investigation of the Redfin Agreements became public.

## JURISDICTION AND VENUE

11.     Jurisdiction is conferred by 28 U.S.C. §1332. Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interest and costs

12.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that would not otherwise have such jurisdiction.

13.     This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

14.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) Zillow is incorporated in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein occurred in this District, including the defendants' primary participation in the wrongful acts detailed herein; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

---

[4] As of Friday, July 10, 2026, Zillow's Class A and Class C common stock closed at $32.00 and $32.19 per share, respectively.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

- 4 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

As such, each of the defendants and Zillow has sufficient minimum contacts to this District such that venue in this Court does not offend traditional notions of fair play and substantial justice.

## THE PARTIES

**Plaintiff**

15.    Plaintiff James Ross was a stockholder of Zillow at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Zillow stockholder. He is a citizen of Florida.

**Nominal Defendant**

16.    Nominal defendant Zillow is a Washington corporation with principal executive offices located at 1301 Second Avenue, Floor 36, Seattle, Washington. Zillow is a diversified, transaction-focused platform of connected solutions that help renters, buyers, sellers and real estate professionals across all residential real estate needs. The Company's Zillow platform is the most visited real estate app and website in the United States, and connects consumers with real estate agents and loan officers as well as related digital solutions. Zillow is based on a living database of approximately 173 million U.S. homes and differentiated content, including the Company's patented proprietary automated valuation model to provide home value estimates, the Zestimate. As of December 31, 2025, the Company had 7,068 employees.

**Defendants**

17.    Defendant Jeremy Wacksman ("Wacksman") has been Zillow's Chief Executive Officer and a director since August 2024. He is a citizen of Washington, His 2025 total compensation from Zillow was approximately $7.1 million.

18.    Defendant Richard N. Barton ("Barton") has been Zillow's Co-Executive Chairman since August 2024, and a director since December 2004. He is a citizen of Washington. His 2025 total compensation from Zillow was approximately $6.9 million,

19.    Defendant Erik Blachford ("Blachford") has been a Zillow director since May 2005. He is a citizen of California. His 2025 total compensation from Zillow was $296,061.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

- 5 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

20. Defendant Amy C. Bohutinsky ("Bohutinsky") has been a Zillow director since October 2018. She is a citizen of Washington.

21. Defendant Jun Choo ("Choo") has been Zillow's Chief Operating Officer since November 2024. He is a citizen of Washington. His 2025 total compensation from Zillow was approximately $9.6 million.

22. Defendant Lloyd D. Frink ("Frink") has been Zillow's Co-Executive Chairman since August 2024; President since February 2005; and a director since December 2004. He is a citizen of Washington. His 2025 total compensation from Zillow was approximately $6.8 million.

23. Defendant J. William Gurley ("Gurley") has been a Zillow director since January 2024. He is a citizen of Texas.

24. Defendant Jay C. Hoag ("Hoag") has been a Zillow director since October 2005. He is a citizen of California.

25. Defendant Jeremy Hofmann ("Hofmann") has been Zillow's Chief Financial Officer since May 2023. He is a citizen of Washington. His 2025 total compensation from Zillow was approximately $5.5 million.

26. Defendant Gregory B. Maffei ("Maffei") has been a Zillow director since May 2005. He is a citizen of Colorado.

27. Defendant Gordon Stephenson ("Stephenson") has been a Zillow director since May 2005. He is a citizen of Washington. His 2025 total compensation from Zillow was $547,299.

28. Defendant Claire Cormier Thielke ("Thielke") has been a Zillow director since October 2020. She is a citizen of Hong Kong. Her 2025 total compensation from Zillow was $484,458.

29. Defendant April Underwood ("Underwood") has been a Zillow director since February 2017. She is a citizen of California. Her 2025 total compensation from Zillow was $484,458.

30. Collectively, the defendants identified in ¶¶17-29 are referred to herein as the "Individual Defendants."

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

- 6 -

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

31.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Zillow and its stockholders fiduciary obligations of care and loyalty, and were and are required to use their utmost ability to control and manage Zillow in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Zillow and not in furtherance of their personal interest or benefit.

32.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the business and financial affairs of the Company. By virtue of such duties, the Individual Defendants were required to, among other things:

(a)     conduct the affairs of the Company in an efficient, businesslike manner in compliance with all applicable laws, rules, and regulations, including antitrust laws and regulations, so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(b)     remain informed as to how Zillow conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

33.     The Individual Defendants, because of their advisory, executive, managerial, and directorial positions of control and authority, were able to and did, directly or indirectly, exercise commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took part in, or substantially, assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and in furtherance of the wrongdoing.

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT

- 7 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

34.    The Company also adopted a Code of Conduct applicable to each of the Individual Defendants as "Company officers, board members and employees (each, a 'Company Person')… in their dealings with or on behalf of the Company." The Code of Conduct acknowledges that the Company's directors and officers are in possession of material nonpublic information and are prohibited from trading on the basis of that information. Specifically, it states:

**Insider Trading**

Company Persons, as well as the Company's representatives, consultants, contractors, vendors, suppliers, and agents who, as a result of their relationship with the Company, are in possession of material non-public information about the Company or other companies, including the Company's suppliers and customers, are prohibited by law and Company policy from trading in securities of the Company or such other companies, as well as from communicating such information to others who might trade on the basis of that information. To assist with compliance with laws against insider trading, the Company has adopted a detailed Insider Trading Policy

35.    Regarding public disclosures, the Code of Conduct states:

**Public Disclosures**

The Company files reports and other documents with regulatory authorities, which may include the United States Securities and Exchange Commission (SEC) and Nasdaq. The Company may make other public communications, such as issuing press releases. All information provided in the Company's public reports and communications must be complete, fair, accurate, timely and understandable, and must also comply with applicable laws, rules and regulations. Any person subject to this Code who is asked to provide information for the Company's public disclosures must use all reasonable efforts to provide complete, fair, accurate, timely and understandable information. If any person subject to this Code becomes aware of any information concerning: (a) material defects in the disclosures made by the Company in its public filings; (b) significant deficiencies in the design or operation of internal controls; (c) any violation of this Code that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls; or (d) any material violation of the law or this Code, such person should follow the guidelines described in the Reporting and Compliance Procedures section. In connection with its public communications, the Company is required to comply with Regulation FD (Fair Disclosure) under the federal securities laws. Regulation FD provides that when the Company discloses material, non-public information ["MNPI"] about it to securities market professionals or shareholders (where it is reasonably foreseeable that the shareholders will trade on the information), the Company must also disclose the information to the public. All Company Persons are required to read carefully and comply with the Company's Media and External Communications Policy.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

- 8 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

36.    Regarding compliance with antitrust laws, the Code of Conduct specifically states:

**Compliance with Antitrust Laws**

Antitrust laws of the United States and other countries are designed to protect consumers and competitors against unfair business practices and to promote and preserve competition. Examples of antitrust violations include coordinating prices with a competitor (known as price fixing) or agreeing with a competitor to restrict the supply or type of products made available to customers. Violations of antitrust laws may result in severe penalties against the Company, its agents and Company Persons, including substantial fines and criminal penalties. Company Persons subject to this Code are expected to maintain basic familiarity with the antitrust principles applicable to their role with the Company and should consult the General Counsel with any questions concerning compliance with these laws.

**Breaches of Duties**

37.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Zillow, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company by, among other things, causing the Company to violate antitrust laws and trading in Company stock while in possession of MNPI.

## SUBSTANTIVE ALLEGATIONS

***Zillow and Redfin Competed in the ILS Market***

38.    Zillow is an online real estate marketplace that helps people buy, sell, rent and finance homes. The Company classifies its revenue into four categories: residential, mortgages, rentals, and other.[5] Zillow explains it earns its revenues in its "rentals" segment by:

advertising and a suite of tools sold to property managers on a cost per lead, lease, listing or impression basis or for a fixed fee for certain advertising packages through both the Zillow and StreetEasy brands. Rentals revenue also includes revenue generated from our rental applications product, through which potential renters can submit applications to multiple properties for a flat service fee

---

[5] https://www.sec.gov/Archives/edgar/data/1617640/000161764026000039/z-20260331.htm#i0d643eab949f448f9904f33615bdb0a8_85

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT
- 9 -
TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

39.    In 2025, Zillow's Rentals segment had 2.4 million average monthly active rental listings.[6] The Company's 2025 revenue from Rentals was $630 million, accounting for 24% of its total revenues for 2025.

40.    An ILS is an online directory or search database that aggregates property listings. The widespread acceptance of the internet facilitated the adoption of ILS. ILSs largely replaced the traditional method of advertising housing rentals, such as local newspapers and classified listings. Rental ILSs are now the primary marketing channel that property management companies, landlords, and other apartment lessors use to advertise apartments for rent.

41.    Zillow asserts that it is the most visited and searched ILS rental network. In May 2024, the Company estimated that it contained more than 50% of all rental listings.

42.    Redfin aggressively completed against Zillow in the ILS rental market since acquiring its competitor, RedPath, in 2021. In a 2024 earnings call, Redfin CEO Glenn Kelman ("Kelman") explained that: "the big players [in the rental ILS market] are getting bigger and the small players are getting smaller, and [Redfin wants] to get on the right side of that,,, Zillow and CoStar have been trying to grab more customers at the expense of some of the smaller players… We're glad to keep growing."

43.    As of May 2024, Redfin's strategy looked like a success. At that time, Redfin CEO Kelman stated, "It's amazing that [Redfin] went from losing $10 million in [the rental segment] a year ago in Q1 to making money for the third straight quarter now. But the next stage in the Rent acquisition is to try to grab share, handover [sic] fist and really to grow the online marketplace."

***Zillow Enters Into the Anticompetitive Agreements with Redfin***

44.    Because Zillow operates throughout the United States, it is subject to both state and federal antitrust laws. This includes the Sherman Antitrust Act, 15 U.S.C. §§ 1-7 (the "Sherman Act," outlawing monopolistic business practices); the Federal Trade Commission Act, 15 U.S.C. §§ 41-58 (the "FTC Act," establishing the FTC and empowering it to investigate violations of the Sherman

---

[6] https://www.sec.gov/Archives/edgar/data/1617640/000161764026000015/z-20251231.htm

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT                     - 10 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

Act, seek monetary penalties, and prohibit unfair and deceptive acts or practices in commerce; and the Clayton Antitrust Act, 15 U.S.C. §§ 12-27 (the "Clayton Act," expanding the scope of the Sherman Act's prohibition on anticompetitive activities).

45.    Section 1 of the Sherman Act is a makes illegal every contract, combination, or conspiracy in restraint of trade or commerce among the several States or with foreign nations. The Sherman Act prohibits agreements that unreasonably restrict competition, with violations punishable by fines and imprisonment.

46.    Section 5 of the FTC Act declares "unfair methods of competition" and "unfair or deceptive acts or practices in or affecting commerce" unlawful. This law grants the FTC the authority to investigate and prohibit a wide range of anticompetitive and fraudulent business conduct, which can include violations of antitrust laws and other activities that harm consumers or competition. The FTC uses Section 5 to enforce rules related to competition, consumer protection, privacy, and security.

47.    Section 7 of the Clayton Act prohibits mergers and acquisitions that "may be substantially to lessen competition, or to tend to create a monopoly." Enacted in 1914 and amended in 1950, this law is a cornerstone of U.S. antitrust law, primarily used to challenge potentially anti-competitive corporate transactions, and is enforced by agencies like the FTC and U.S. Department of Justice.

48.    Zillow is also required to adhere to federal guidelines regarding mergers. The 2023 U.S. Department of Justice and FTC Merger Guidelines employ a metric known as the Herfindahl-Hirschman Index ("HHI") to assess market concentration. The FTC Merger Guidelines explain that markets with an HHI over 1,800 are considered highly concentrated, and a change in market concentration of more than 100 points is considered a significant increase. At these levels, acquisitions are presumed to substantially lessen competition.

49.    Seeing the impending competition from Redfin, Zillow entered into the Partnership and Content License Agreements with Redfin on February 6, 2025. Pursuant to the Partnership

- 11 -

Agreement, in exchange for receiving $100 million from Zillow, Redfin agreed to facilitate the transition of the bulk of its multifamily rental advertising business to Zillow and shut down the remainder. The Partnership Agreement required Redfin to terminate all of its advertising contracts with managers of multifamily rental properties of 25 units or greater. Specifically, in relevant part:

(a) ████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██ ██ ███ ████ █ ████ █████ █████ ██████ █ ██
████████████

(b) ████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████

(c) ████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

[7] ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████

[8] ████████████████████████████████████
████████████████████

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

(d) ███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████

(e) ██████████████████████████████████

██████████████████████████████████

50.    Pursuant to the Content License Agreement, Redfin has agreed to stay out of the market for up to 9 years and to use its network to show only rental listings that are also displayed on Zillow's platform. Specifically, in relevant part:

(a) ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████

(b) ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

_____

[9] ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

- 13 -

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████

(c)     ████████████████████████████████████████████████

████████████████████████████████████████████████████████

51.    As alleged in the FTC Action, the transition mechanics were designed to hand Redfin's book of business to Zillow quickly and comprehensively. Redfin was required to use its "reasonable best efforts" to introduce Zillow's sales representatives to each multifamily advertising customer, provide prompt updates on all customer communications, and maintain adequate sales operations during the handoff so that customer relationships did not lapse before Zillow could contract them, thereby ensuring continuity while the business shifted to Zillow. To enable immediate conversion of accounts, Redfin turned over competitively sensitive information—including detailed customer and contract information—to Zillow, which was expressly intended to make it easier for Zillow to capture Redfin's customers under Zillow's contracts. Redfin also sent direct communications to its multifamily advertisers to facilitate the switch, and within months Zillow had signed contracts covering a substantial portion of properties that had been previously listed on Redfin but not on Zillow, evidencing the scale of the transfer.

52.    As alleged in the FTC Action. workforce terms reinforced the handoff of commercial knowhow and relationships. Redfin terminated approximately 450 employees associated with its ILS rentals advertising business and provided Zillow with information about those personnel, which Zillow then used to selectively hire former Redfin salespeople and support staff, preserving key property management company relationships and accelerating account migration under Zillow's platform. Redfin also provided additional internal operational and marketing information to aid the

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT

- 14 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

transition of active pipelines and processes, further integrating execution capabilities into Zillow's organization.

53.    Notwithstanding the parties' characterization of the Agreements as a "partnership," they amount to Zillow acquiring Redfin's multifamily ILS rental business for up to 9 years. Redfin agreed to facilitate this, and Zillow agreed to pay Redfin $175 million up front plus a continuing royalty.

54.    By June 15, 2025, Redfin deactivated multifamily listings for customers that did not sign with Zillow and sunset its Digital Marketing Solutions ("DMS")—including social-media management and search-term optimization tools—removing complementary marketing products that had supported Redfin's rentals ads and signaling the complete cessation of Redfin's standalone ILS advertising operations in multifamily. The cumulative effect was to transform Redfin from an independent, growing competitor into a site hosting syndicated copies of Zillow's listings for multifamily, with Redfin's former ad-sales function, customer relationships, and related personnel repositioned around Zillow's marketplace structure.

55.    In its filings for the quarter ending March 31, 2025, Zillow reported a $100 million payment to Redfin under "intangible Assets," under the label "Customer relationships."

56.    The Agreements are plainly anticompetitive. The deal terms sit within an already highly concentrated ILS advertising landscape in which Zillow, Redfin, and CoStar Group, Inc. were the clear leaders by traffic and revenue, and the arrangement eliminates one of the limited nationwide alternatives that advertisers had used to reach renters at scale. The described consequences include higher prices and worse terms or quality for advertisers, diminished differentiation across platforms because Redfin's rentals pages host Zillow's inventory, and reduced incentives for Redfin to invest in renter traffic and user experience given that its multifamily revenue in this segment shifts from selling ads to lead-based compensation from Zillow with a guaranteed first-year minimum.

57.    For current and former overlap customers—those who previously listed on both platforms—the consolidation can require more expensive tiers or network-wide placements to obtain

comparable visibility within a more crowded, Zillow-syndicated environment on the very same websites where they once purchased distinct Redfin placements, reflecting a direct change in commercial leverage and configuration after the transition. The overall market result is that competition on the merits between these two firms for multifamily ILS advertising customers is removed, and Redfin's distinctive product and DMS are withdrawn, leaving advertisers with fewer independent options and renters with less differentiated discovery experiences across large national portals.

58.    There are a variety of different market share metrics that are informative as to the competitive significance of ILSs, including, but not limited to, revenue, traffic, and listings. Using revenue, traffic, or listings, the relevant markets are highly concentrated. The nationwide market for ILS advertising in general and multifamily advertising in particular both have an HHI well over 1,800 and thus are highly concentrated.[10] Smaller relevant geographic markets for ILS advertising are likely even more concentrated.

59.    The same result follows when viewing the Agreements as an acquisition, as the transactions contemplated thereunder would result in a change in market concentration well over 100 points in all relevant markets. Both the nationwide market for ILS advertising and the nationwide market for ILS multifamily advertising have HHIs well over 2,500, and the unlawful agreements will result in a change in market concentration well over 200 points in each relevant market. Under any relevant metric, Zillow holds a large share of these highly concentrated markets and any deals that further concentrate these markets would likely garner regulatory intervention.

***Defendants Knew the Agreements Violated Antitrust Laws***

60.    The structure of the Agreements caught the attention of the FTC and several Attorneys General. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[10] *See* ¶ 47, *supra*.

61. █████████████████████████████████████████████

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480



62.

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT

- 19 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

63.     As subsequently held by Senior Judge Trenga in the FTC Action, "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question have an anticompetitive effect on customers and markets." FTC Action, ECF No. 154 at 3 n.4.

64.     ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████

65.     ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████

[11] ████████████████████████████████████████████████████████
████████████████████████████████████████████████

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

66. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████

67. ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████
████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████
████████████████████

68. ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████

███████████████████████████████████
███████████████████████████████████
█████████████████████████████
████████████████████████████
██████████████████████████████████
███████████████████████████
████████████████████

*The Agreements Lead to Lawsuits Against Zillow*

69.     On September 30, 2025, the FTC Action was filed, alleging that Zillow and Redfin entered into an unlawful agreement to suppress competition in the market for multifamily rental housing advertising. The FTC alleges that in February 2025, Zillow paid Redfin $100 million and provided other compensation in exchange for Redfin's agreement to terminate its rental-advertising contracts, exit the multifamily property advertising market for up to nine years, and become an exclusive syndicator of Zillow's listings—essentially turning Redfin's rental pages into duplicates of Zillow's content.

70.     According to the FTC, the companies mischaracterized the arrangement as a "partnership," but the Agreements were in reality a deliberate effort to eliminate Redfin as a rival and insulate Zillow from competition. Redfin even laid off hundreds of employees following the agreements, while Zillow subsequently hired selected former Redfin workers, underscoring the anticompetitive nature of the deal. By entering into the Agreements, the FTC alleges that Zillow violated both Section 1 of the Sherman Act, Section 5 of the FTC Act, and Section 7 of the Clayton Act, constituting an unlawful acquisition and agreement to restrain trade.

71.     The FTC's complaint emphasizes that this deal harms property managers (who now face fewer advertising options and potentially higher prices) and renters (who may see reduced innovation and fewer choices when searching for apartments online). It seeks to bar Zillow and Redfin from maintaining or enforcing the agreements, and contemplates potential divestitures or structural

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT                     - 22 -                     TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

remedies to restore market competition. The FTC's decision to bring the case was unanimous (3-0), and the Commission has stated that it worked closely with several state Attorneys General during its investigation.

72. The FTC also gave statements regarding Zillow's unlaw conduct. "Paying off a competitor to stop competing against you is a violation of federal antitrust laws," said Daniel Guarnera, Director of the FTC's Bureau of Competition. "Zillow paid millions of dollars to eliminate Redfin as an independent competitor in an already concentrated advertising market—one that's critical for renters, property managers, and the health of the overall U.S. housing market. The FTC will do our part to ensure that Americans who are looking for safe, affordable rentals receive all the benefits of robust competition between internet listing services like Zillow and Redfin."

73. On October 1, 2025, the Attorneys General of the Commonwealth of Virginia, Arizona, Connecticut, New York, and Washington filed a lawsuit in the U.S. District Court for the Eastern District of Virginia against Zillow and Redfin, captioned *Commonwealth of Va. et al. v. Zillow Group, Inc. et al.*, Case No. 1:25cv1647 (E.D. Va.) (the "AG Action" and together with the FTC Action, the "Antitrust Actions"), alleging that Zillow and Redfin entered into unlawful agreements to suppress competition in the market for multifamily rental housing advertising.

74. Similar to the FTC Action, the AG Action alleges that Zillow and Redfin schemed to eliminate competition through several means, including a $100 million payment from Zillow to Redfin. The AG Action further alleges that the "unlawful agreements" by Zillow and Redfin "will result in reduced choice, higher prices, and reduced quality for multifamily rental advertising customers and will provide no cognizable procompetitive benefits." The Attorneys General brought claims for violating Section 1 of the Sherman Act and Section 7 of the Clayton Act. Attorney General Letitia James of New York commented on the lawsuit, stating:

> Millions of New Yorkers rely on online apartment listings to find an affordable and safe place to live… Zillow's attempt to shut down its competition could drive up costs for advertisers and leave renters with fewer options when searching for a new apartment. New Yorkers are already

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

- 23 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

struggling with an unaffordable housing market, and I will fight to stop this illegal deal that could make it even harder to find a home.

75.    As noted in NY Attorney General James' accompanying announcement,

The market for online apartment rental advertising is already highly concentrated, with just three companies – Zillow, Redfin, and CoStar (owner of Apartments.com) – accounting for 85 percent of all market revenue. For years, these companies have competed fiercely to sell advertising to property management companies and landlords and attract prospective renters. This competition incentivized Redfin and Zillow to invest in improving their user experiences to attract more advertisers and renters.

Competition between Zillow and Redfin ended when they implemented an unlawful scheme through two agreements signed on February 6, 2025, a Partnership Agreement and a Content License Agreement. Under the Partnership Agreement, Zillow paid Redfin $100 million to exit the market for advertising apartments in buildings with 25 units or more and transfer Redfin's multifamily advertising business to Zillow, its direct competitor. Under the Content License Agreement, Redfin agreed to stay out of the multifamily advertising market for up to nine years and instead use its network to show only apartment rental listings that are also displayed on Zillow's sites. While the agreement is currently limited to buildings with 25 or more units, it expressly proposes an extension to all apartment buildings. As a result of this unlawful agreement, Redfin fired approximately 450 employees associated with its multifamily rental advertising business.

Attorney General James and the coalition argue that Zillow and Redfin's unlawful scheme significantly hurts competition in the apartment advertising market. This lack of competition could result in higher prices, lower-quality rental advertising, and fewer choices – both for landlords seeking to advertise rentals and for renters seeking a home.

Zillow and Redfin's unlawful agreements could also harm prospective renters by undermining the companies' incentives to compete for traffic. Attorney General James and the coalition argue that under the agreements, Redfin will earn revenue by referring renters to Zillow, reducing its incentives to improve its user experience and innovate to attract new customers.

Attorney General James and the coalition are seeking a court ruling declaring that Zillow and Redfin's agreements violate federal antitrust laws and an injunction that would prohibit Zillow and Redfin from engaging in their unlawful conduct and restore competition. The lawsuit also proposes divestiture of assets or reconstruction of businesses to restore competition.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

- 24 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

## DEFENDANTS MAKE A SERIES OF FALSE STATEMENTS
## CONCERNING ZILLOW'S ANTITRUST EXPOSURE

76.    Zillow's public disclosures concerning the Agreements were rife with false and misleading statements from the start.

77.    Zillow announced the Agreements on February 11, 2025, disclosing "a ***partnership*** making Zillow the exclusive provider of multifamily rental listings… on Redfin and its sites[.]"

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████

78.    Also on February 11, 2025, Zillow filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2024 (the "2024 Form 10-K"), signed by defendant Wacksman, Hofmann, Rock, Barton, Frink, Blachford, Bohutinsky, Gurley, Hoag, Maffei, Stephenson, Thielke, and Underwood. The 2024 Form 10-K contained the following risk disclosure under the heading "[w]e are from time to time involved in, and have in the past or may in the future be subject to claims, suits, government investigations, and other proceedings that may result in adverse outcomes", stating in pertinent part:

> We are from time to time involved in, and have in the past or may in the future be subject to claims, suits, government investigations, enforcement actions and proceedings arising from our business, including actions with respect to intellectual property, privacy, consumer protection, information security, mortgage brokering, mortgage origination, real estate, real estate brokerage, environmental, data protection, ***antitrust***, the Real Estate Settlement Procedures Act of 1974 (RESPA), fair housing or fair lending, compliance with securities laws, or law enforcement matters, tax matters, labor and employment, and commercial claims, as well as actions involving content generated by our customers, shareholder derivative actions, purported class action lawsuits, and other matters.

\*    \*    \*

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

- 25 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

Such claims, suits, government investigations, and proceedings are inherently uncertain, and their results cannot be predicted with certainty. Regardless of the outcome, any such legal proceedings can have an adverse impact on us because of legal costs, diversion of management and other personnel, and other factors. In addition, it is possible that a resolution of one or more such proceedings could result in reputational harm, liability, fines, penalties, or sanctions, as well as judgments, consent decrees, or orders preventing us from offering certain features, functionalities, products, or services, or requiring a change in our business practices, products or technologies, which could in the future materially and adversely affect our business, operating results and financial condition.

79.    The 2024 Form 10-K contained the following discussion concerning the Company's dealings with Redfin, including the Agreements:

On February 6, 2025, we entered into a partnership ("rentals partnership") with Redfin Corporation ("Redfin"), making Zillow the exclusive provider of multifamily rental listings (properties with 25 or more units) on Redfin and its sites, including Rent.com and ApartmentGuide.com (together, "Redfin Rental Network"). Redfin will facilitate Zillow's entry into advertising agreements with property management companies that currently provide rental listings on Redfin. Pursuant to this rentals partnership, Zillow will make a $100 million upfront payment to Redfin and will pay Redfin for leads generated through the Redfin Rental Network for an initial period of five years with two optional two year extensions, subject to the terms of the underlying agreements. We have not yet completed our evaluation of the impact this rentals partnership will have on our consolidated financial statements.

80.    After the FTC Action was filed on September 30, 2025, Zillow downplayed the allegations. CNBC quotes a Zillow spokesperson stating the following in response to the FTC Action:

Our listing syndication with Redfin benefits both renters and property managers and has expanded renters' access to multifamily listings across multiple platforms[.] It is pro-competitive and pro-consumer by connecting property managers to more high-intent renters so they can fill their vacancies and more renters can get home. We remain confident in this partnership and the enhanced value it has delivered and will continue to deliver to consumers.

81.    The above statements were materially false and misleading. In truth, the Agreements were not a "partnership" but instead an effort by Zillow to eliminate a competitor. Further, Zillow faced significant legal and regulatory risk and heighted expenses from the Agreements and ensuing Antitrust Actions.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

- 26 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

**THE TRUTH EMERGES**

82.    On February 10, 2026, the Company held an earnings conference call to discuss its fourth quarter of 2025 earnings. During the call, defendant Hofmann admitted that the Company faced "elevated legal expenses" and that these expenses were causing a "200 basis points headwind to EBITDA margins in Q1." In particular, defendant Hofmann stated:

> Last, we have ongoing elevated legal expenses. Of note, we estimate year-over-year increases in legal expenses will result in approximately 200 basis points headwind to EBITDA margins in Q1.
>
> *        *        *
>
> Expenses of $505 million were slightly above our outlook due to higher-than-expected legal expenses.

83.    On May 6, 2026, after the close of the market, Senior United States District Judge Trenga denied Zillow and Redfin's motion to dismiss the FTC Action. The Court's decision underscored the seriousness of the allegations against Zillow and showed the general market that Zillow would have to continue facing "elevated" legal expenses as it continues to defend itself and eventually settle or pay a judgment in the Antitrust Actions.

84.    As the market absorbed this news over the following week, Zillow's Class A stock fell to $37.86, on May 14, 2026, from a pre-disclosure per share price of $44.83. During this same time period, the Company's Class C stock fell from $44.53 to $37.37. Altogether, Zillow's market capitalization fell nearly $1.6 billion. As of Friday, July 10, 2026, Zillow's Class A and Class C common stock closed at $32.00 and $32.19 per share, respectively.

85.    On June 9, 2026, investors filed the Securities Class Action, which will cause the Company to incur even additional legal expenses if not the still further expense of a settlement or adverse verdict through trial.

**INSIDER SALES BY INSIDER SELLING DEFENDANTS**

86.    Rather than providing the market with correct information, defendants Frink, Barton, Choo, Hofmann, Wacksman, Stephenson, Thielke, Blachford, and Underwood used their knowledge of Zillow's material, nonpublic information and the anticompetitive nature of the Agreements and

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT

- 27 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

transactions effected thereunder to sell their personal holdings while the Company's stock was artificially inflated. As officers and directors of Zillow, these defendants were privy to material, nonpublic information about the Company's true business health.

87.     The Insider Selling Defendants sold over $87 million worth of stock at artificially inflated prices as detailed by the table below, arranged in order of total proceeds:

| Defendant | Sale Date | Shares Sold | Price Per Share | Proceeds |
| --- | --- | --- | --- | --- |
| **Frink** | 7/22/2025 | 52,866 | $80.25 | $4,242,364.34 |
| | 7/23/2025 | 15,475 | $80.60 | $1,247,334.52 |
| | 7/23/2025 | 11,659 | $81.24 | $947,145.68 |
| | 8/11/2025 | 623 | $80.72 | $50,287.13 |
| | 8/11/2025 | 48 | $81.23 | $3,899.04 |
| | 8/12/2025 | 5,483 | $80.30 | $440,283.80 |
| | 8/12/2025 | 512 | $81.07 | $41,507.48 |
| | 8/13/2025 | 1,016 | $80.89 | $82,185.05 |
| | 8/13/2025 | 928 | $82.04 | $76,130.34 |
| | 8/13/2025 | 257 | $83.36 | $21,423.80 |
| | 8/13/2025 | 1,121 | $84.30 | $94,502.09 |
| | 8/13/2025 | 12 | $84.86 | $1,018.32 |
| | 8/14/2025 | 150,000 | $85.00 | $12,750,000.00 |
| | 8/14/2025 | 100,000 | $85.00 | $8,500,000.00 |
| | 8/27/2025 | 2,232 | $84.74 | $189,148.61 |
| | 8/27/2025 | 777 | $85.41 | $66,363.10 |
| | 8/27/2025 | 324 | $86.38 | $27,986.67 |
| | 8/28/2025 | 2,175 | $84.31 | $183,375.99 |
| | 8/28/2025 | 1,158 | $84.99 | $98,422.59 |
| | 8/29/2025 | 3,091 | $84.58 | $261,445.74 |
| | 8/29/2025 | 243 | $85.44 | $20,762.04 |
| | 9/10/2025 | 1,879 | $85.97 | $161,536.69 |
| | 9/10/2025 | 945 | $87.09 | $82,299.48 |
| | 9/10/2025 | 461 | $87.93 | $40,535.73 |
| | 9/10/2025 | 48 | $88.72 | $4,258.56 |
| | 9/11/2025 | 254 | $85.64 | $21,752.59 |
| | 9/11/2025 | 530 | $87.64 | $46,446.76 |
| | 9/11/2025 | 1,431 | $88.60 | $126,785.60 |
| | 9/11/2025 | 1,118 | $89.39 | $99,938.58 |
| | 9/12/2025 | 3,238 | $88.21 | $285,616.21 |
| | 9/12/2025 | 96 | $88.95 | $8,539.20 |
| | 9/22/2025 | 1,315 | $81.27 | $106,865.05 |
| | 9/22/2025 | 515 | $82.39 | $42,429.82 |
| | 9/22/2025 | 1,393 | $83.88 | $116,850.27 |
| | 9/22/2025 | 110 | $84.68 | $9,315.30 |

| Name | Date | Shares | Price | Total |
|---|---|---|---|---|
| | 9/23/2025 | 1,448 | $80.41 | $116,429.34 |
| | 9/23/2025 | 264 | $81.24 | $21,447.60 |
| | 9/24/2025 | 787 | $80.19 | $63,107.88 |
| | 2/9/2026 | 9,158 | $54.63 | $500,284.14 |
| | 2/9/2026 | 100 | $55.17 | $5,517.00 |
| | **Total:** | **375,090** | | **$31,205,542.12** |
| | | | | |
| **Barton** | 8/14/2025 | 40,220 | $84.06 | $3,380,865.05 |
| | 8/14/2025 | 146,111 | $85.10 | $12,434,732.82 |
| | 8/14/2025 | 13,669 | $85.49 | $1,168,595.62 |
| | 8/15/2025 | 77,431 | $85.53 | $6,622,712.15 |
| | 8/15/2025 | 22,569 | $85.93 | $1,939,460.24 |
| | 8/15/2025 | 50,000 | $85.79 | $4,289,430.00 |
| | **Total:** | **350,000** | | **$29,835,795.87** |
| | | | | |
| **Choo** | 2/27/2025 | 49,959 | $78.14 | $3,903,686.35 |
| | 2/27/2025 | 5,041 | $78.58 | $396,145.47 |
| | 5/8/2025 | 11,725 | $68.77 | $806,338.80 |
| | 5/9/2025 | 22,650 | $68.06 | $1,541,502.38 |
| | 5/12/2025 | 10,000 | $70.65 | $706,541.00 |
| | 8/7/2025 | 45,710 | $85.21 | $3,894,971.96 |
| | 9/8/2025 | 25,575 | $91.06 | $2,328,890.19 |
| | **Total:** | **170,660** | | **$13,578,076.15** |
| | | | | |
| **Hofmann** | 1/28/2025 | 1,612 | $84.98 | $136,987.76 |
| | 1/30/2025 | 23,388 | $84.98 | $1,987,512.24 |
| | 2/18/2025 | 7,171 | $79.97 | $573,464.87 |
| | 5/16/2025 | 7,859 | $68.97 | $542,057.24 |
| | 5/16/2025 | 100 | $69.47 | $6,947.49 |
| | 8/15/2025 | 8,168 | $85.35 | $697,138.80 |
| | 9/8/2025 | 25,000 | $89.99 | $2,249,840.00 |
| | 11/14/2025 | 7,865 | $69.53 | $546,853.45 |
| | **Total:** | **81,163** | | **$6,740,801.85** |
| | | | | |
| **Wacksman** | 2/18/2025 | 8,707 | $80.45 | $700,503.40 |
| | 2/18/2025 | 2,111 | $81.11 | $171,231.02 |
| | 5/16/2025 | 10,878 | $68.98 | $750,347.04 |
| | 5/16/2025 | 106 | $69.47 | $7,364.34 |
| | 8/15/2025 | 6,678 | $85.58 | $571,477.20 |
| | 8/15/2025 | 4,597 | $85.95 | $395,091.92 |
| | 11/14/2025 | 10,855 | $69.99 | $759,733.85 |
| | **Total:** | **43,932** | | **$3,355,748.77** |
| | | | | |
| **Stephenson** | 5/13/2025 | 10,000 | $70.69 | $706,883.00 |
| | 8/8/2025 | 6,835 | $82.08 | $561,007.91 |
| | **Total:** | **16,835** | | **$1,267,890.91** |
| | | | | |
| **Thielke** | 3/4/2025 | 1,413 | $73.11 | $103,304.43 |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

- 29 -

| | | | | |
|---|---|---|---|---|
| | 6/12/2025 | 241 | $70.45 | $16,978.45 |
| | 8/11/2025 | 8,247 | $79.86 | $658,577.38 |
| | 9/3/2025 | 242 | $81.91 | $19,822.22 |
| | 12/3/2025 | 241 | $72.51 | $17,474.91 |
| | Total: | 10,384 | | $816,157.39 |
| | | | | |
| Underwood | 8/7/2025 | 595 | $86.01 | $51,178.75 |
| | 9/8/2025 | 3,621 | $90.12 | $326,307.50 |
| | Total: | 4,216 | | $377,486.25 |
| | | | | |
| Blachford | 3/3/2025 | 1,413 | $75.33 | $106,440.16 |
| | 6/9/2025 | 965 | $70.35 | $67,887.75 |
| | 9/3/2025 | 966 | $81.91 | $79,125.06 |
| | 12/3/2025 | 965 | $72.51 | $69,972.15 |
| | Total: | 4,309 | | $323,425.12 |
| | | | | |
| | Grand Total: | 1,056,589 | | $87,500,924.43 |

88.     Certain of the defendants' sales were particularly suspicious because of the size of their sales relative to their total holdings. In particular: Thielke sold 98% of her Zillow stock; Underwood sold 90% of her Zillow stock; Choo sold 58.4% of his Zillow stock; Hofmann sold 47% of his Zillow stock; Wacksman sold 21% of his Zillow stock; and Stephenson sold 20% of his Zillow stock.

89.     Certain of the defendants' sales are further suspicious because of the length of time between the first sale made with knowledge of MNPI and the most recent prior sale. In particular: Frink's most recent prior sale was on December 2, 2024, over seven months before his first sale with knowledge of MNPI on July 22, 2025; Barton's most recent prior sale was on March 16, 2021, almost 4½ years before his first sale with MNPI on August 14, 2025; Stephenson's most recent prior sale was on February 18, 2021, over four years before his first sale with MNPI on May 13, 2025; and Underwood's most recent prior sale was on December 3, 2024, over eight months before her first sale with MNPI on August 7, 2025.

90.     Certain of the defendants' sales are further suspicious because of the length of time after their last sale made with knowledge of MNPI before they made their next sale. In particular, Stephenson's last sale with knowledge of MNPI was August 8, 2025, and he has made no further sales as of the date of this Complaint over 11 months later; and Underwood's last sale with knowledge

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT

- 30 -

of MNPI was on September 8, 2025, and she has made no further sales as of the date of this Complaint over ten months later.

91.     Finally, each of the selling defendants' sales are suspicious because of the proceeds of their sales relative to their compensation from Zillow. Frink's sales totaled approximately $31.2 million, over 4½ times his total 2025 compensation from Zillow. Barton's sales totaled approximately $29.8 million, over 4.3 times his total 2025 compensation from Zillow. Choo's sales totaled approximately $13.6 million, over 1.4 times his total 2025 compensation from Zillow. Hofmann's sales totaled $6.7 million, or 1.2 times his total 2025 compensation from Zillow. Wacksman's sales totaled $3.4 million, almost 47% of his total 2025 compensation from Zillow. Stephenson's sales totaled over $1.2 million, over twice his total 2025 compensation from Zillow. Thielke's sales totaled $816,157.39, over 1.6 times her total 2025 compensation from Zillow. Underwood's sales totaled $377,486.25, over 77% of his total 2025 compensation from Zillow. Finally, Blachford's sales totaled $323,425.12, almost 110% of his total 2025 compensation from Zillow.

## **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

92.     Plaintiff repeats and reallege each and every allegation above as though they are set forth in full herein.

93.     Plaintiff brings this action derivatively in the right and for the benefit of Zillow to redress injuries suffered, and to be suffered, by Zillow as a direct result of breaches of fiduciary duty by the Individual Defendants. Zillow is named as a nominal defendant solely in a derivative capacity.

94.     Plaintiff will adequately and fairly represent the interests of Zillow in enforcing and prosecuting its rights.

95.     Plaintiff was a stockholder of Zillow at the time of the wrongdoing complained of, have continuously been a stockholder since that time, and is a current Zillow stockholder.

96.     The current Board of Zillow consists of the following 11 individuals: defendants Barton, Blachford, Bohutinsky, Frink, Gurley, Hoag, Maffei, Stephenson, Thielke, Underwood, and

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

- 31 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

Wacksman. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

97. The entire Board faces a substantial likelihood of liability for approving the facially illegal Agreements and for making the false and misleading statements in the Company's 2024 Form 10-K.

98. Defendants Barton, Blachford, Frink, Stephenson, Thielke, Underwood, and Wacksman are interested in this action because they sold a material amount of their Zillow stock on the basis of MNPI.

99. As alleged detailed above, defendants Barton, Blachford, Bohutinsky, Frink, Gurley, Hoag, Maffei, Stephenson, Thielke, Underwood, and Wacksman made the false and misleading statements in the Company's 2024 Form 10-K.

**COUNT I**

**Against the Individual Defendants for Breach of Fiduciary Duty**

100. Plaintiff repeats and realleges each and every allegation above as though they are set forth in full herein.

101. The Individual Defendants owed and owe Zillow fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Zillow the highest obligation of loyalty and care.

102. Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, and reasonable inquiry, causing the Company to engage in the misconduct described herein.

103. The Individual Defendants had actual or constructive knowledge that the Company entered into illegal anticompetitive agreements with Redfin, issued materially false and misleading statements, and failed to correct the Company's public statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

- 32 -

though such facts were available to them. Such material misrepresentations and omissions were committed knowingly, recklessly, and for the purpose and effect of artificially inflating the price of the Company's securities.

104.    The Individual Defendants failed to correct or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact described herein, rendering them personally liable to the Company for breaching their fiduciary duties.

105.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent its publicly reported financials. These actions could not have been a good-faith exercise of prudent business judgment to protect and promote the Company's corporate assets.

106.    Defendants Frink, Barton, Choo, Hofmann, Wacksman, Stephenson, Thielke, Underwood, and Blachford further breached their duties to the Company by selling their shares of Company stock while in possession of the Company's MNPI.

107.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Zillow has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

108.    Plaintiff, on behalf of Zillow, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of Zillow, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties;

B.    Directing Zillow to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Zillow and its stockholders from a repeat of the damaging events described herein;

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

- 33 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

C.       Extraordinary equitable and injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of the insider trading defendants' trading activities or their other assets so as to assure that plaintiffs on behalf of Zillow have an effective remedy;

D.       Awarding to Zillow restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.       Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.       Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: July ___, 2026

**TOWNSEND LEGAL, PLLC**
By: /s/ Roger M. Townsend
Roger M. Townsend, WSBA# 25525
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480
Facsimile: (206) 455-9555
E-mail: roger@townsendlegal.com

**LEVI & KORSINSKY, LLP**
GREGORY M. NESPOLE (*PHV forthcoming*)
DANIEL TEPPER (*PHV forthcoming*)
CORREY A. SUK (*PHV forthcoming*)
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
E-mail: gnespole@zlk.com
              dtepper@zlk.com
              csuk@zlk.com

*Attorneys for Plaintiff*

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

- 34 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480